FILED

2024 Dec-10  AM 11:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **PRO-BUILT DEVELOPMENT LLC,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:21-cv-01477-RDP** |
| | } | |
| **DELTA OIL SERVICES INC. et al.,** | } | |
| | } | |
| **Defendants.** | } | |
| | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Delta Oil Services Inc.'s Motion for Summary Judgment (Doc. # 62), Defendant Burgess Equipment Repair LLC's Motion for Summary Judgment (Doc. # 72), and a Motion in Limine to Exclude Testimony of Abner Patton filed by both Defendants Delta Oil Services Inc. and Burgess Equipment Repair LLC (Doc. # 86). The parties have fully briefed the Motions for Summary Judgment (Docs. # 87, 93, 94, 96, 97), as well as the Motion in Limine (Docs. # 90, 91, 92). For the reasons explained below, both Motions for Summary Judgment (Docs. # 62, 72) are due to be granted and Defendants' Motion in Limine (Doc. # 86) is moot.

## I.    Factual Background

The court has gleaned the facts set out in this opinion from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.    The Parties

Wade Burgess ("Mr. Burgess") is the primary owner of Burgess Equipment Repair ("Burgess"). (Docs. # 63-2 at 4; 87 at 4 ¶ 3; 94 at 5 ¶ 3). Defendant Burgess Equipment Repair, LLC owns property adjacent to the Pro-Built property. (Docs. # 63-1 at 20; 87 at 4 ¶ 4; 94 at 5 ¶ 1). Burgess opened its physical office around 2010 or 2011. (Docs. # 90-2 at 22, 53; 93 at 11 ¶ 1; 97 at 4 ¶ 1). An unnamed tributary of Carroll Creek runs across the property owned by Burgess and in turn across the property owned by Plaintiff Pro-Built. (Docs. # 72-1 at 3 ¶ 5; 93 at 4 ¶ 1). Carroll Creek is a "water of the state" of Alabama. (Doc. # 90-15 at 2). The northwestern portion of the Pro-Built property is adjacent to the southwestern portion of the Burgess property. (Doc. # 90-7 at 6).

Delta Oil Services, Inc. ("Delta Oil") is a used oil recycling company. (Docs. # 87 at 4 ¶ 5; 94 at 5 ¶ 1; 90-15 at 1). Since around 2017, Burgess had allowed Delta Oil to park several of its tanker trucks – usually three at a time – on Burgess's property and worked on Delta Oil trucks in exchange for Delta Oil's removal of Burgess's waste oil. (Docs. # 63-2 at 8; 87 at 4 ¶ 6; 94 at 5 ¶ 6; 90-2 at 5, 7; 93 at 11 ¶ 2; 97 at 4 ¶ 2). "[F]rom time to time," Burgess also allowed Delta Oil to store their chemical totes and drums on Burgess's property. (Docs. # 90-2 at 6, 22; 93 at 11 ¶ 4; 97 at 4 ¶ 4). Mr. Burgess testified that all the totes and drums of oil on Burgess's property were owned by Delta Oil, not by Burgess. (Doc. # 90-2 at 6, 20, 22).

### B.    The Spill

On the night of April 15, 2021, Greg Fontaine, who was an Emergency Management Specialist with the Tuscaloosa County Emergency Management Agency, investigated a spill of what he believed to be a petroleum product near the Burgess property. (Docs. # 64-1 at 31-32; 87 at 4 ¶ 7; 94 at 5 ¶ 3, 12 ¶ 7(a); 93 at 10 ¶ 1; 97 at 3 ¶ 1; 96 at 7 ¶ 7(a)). When he arrived, Fontaine

went to the southwestern edge of Burgess's property and saw several of Delta Oil's "short-haul transport tanker trucks" parked close to the edge of the embankment. (Docs. # 90-17 at 8-9, 13, 32; 94 at 12 ¶ 7(b); 96 at 7 ¶ 7(b); 93 at 10 ¶ 2; 97 at 3 ¶ 2). Fontaine said he saw petroleum contamination floating in the creek and an area blackened by petroleum. (Docs. # 90-17 at 32, 36; 93 at 11 ¶¶ 4-5; 97 at 3 ¶¶ 4-5). Fontaine also saw two sets of tire tracks running from the back of the Delta Oil trucks to the area where the petroleum contamination was found. (Docs. # 90-17 at 33; 93 at 11 ¶ 6; 97 at 4 ¶ 6).

Timothy Wynn is a Senior Environmental Scientist with the Alabama Department of Environmental Management ("ADEM") who was on call the week of April 15, 2021, as part of an ADEM Emergency Response Team. (Docs. # 60-4 at 3, 5; 72-1 at 8 ¶¶ 11-12; 93 at 4 ¶ 1, 7-8 ¶ 1; 97 at 1 ¶ 1; 67-1 at 3; 87 at 5 ¶ 10; 94 at 5 ¶ 10). On April 16, 2021, Wynn went out to the Burgess site to perform an investigation because people reported "smelling vapors" in that location. (Docs. # 60-4 at 5, 7; 72-1 at 8 ¶ 13; 93 at 4 ¶ 1; 67-1 at 7; 87 at 5 ¶ 12; 94 at 5 ¶ 10). Wynn observed and photographed petroleum product that was leaking into the unnamed tributary of Carroll Creek that runs through Pro-Built's land. (Docs. # 60-4 at 7-9; 90-10 at 6, 9; 93 at 8 ¶ 2; 97 at 1 ¶ 2). Wynn observed the product pooling in a 100 feet by 100 feet area on a floodplain below the embankment at the back of the Burgess parking lot. (Doc. # 60-4 at 9). Wynn also testified that he saw petroleum and sheens in the creek well past the 100 foot by 100 foot area of land impacted by the pooling. (Docs. # 60-4 at 36-38; 90-10 at 7, 9, 21, 31, 32; 93 at 8 ¶ 3; 97 at 2 ¶ 3; 94 at 10 ¶ 2(c); 96 at 4 ¶ 2(c)).

Wynn also observed that Delta Oil tanker trucks were parked directly above the contamination area and that there was staining on the ground behind the trucks. (Docs. # 60-4 at 11; 93 at 8 ¶ 5; 97 at 2 ¶ 5). He testified that it looked like the tankers were the "source of the

contamination," and that he believed there had been a "fairly large release" of product from the trucks. (Docs. # 60-4 at 33, 42). Wynn saw and photographed tire tracks on the dirt road that linked the Delta Oil trucks to the brush pile where the spill appeared to have started, although he noted that there was not a continuous trail of a spill from the brush pile to the trucks. (Docs. # 60-4 at 36; 90-10 at 16-18).

Eddie Wiggins is a 50% owner of Pro-Built Development, LLC and testified that he became aware of the spill when the fire department contacted him and when the Environmental Protection Agency ("EPA") called him in April 2021. (Docs. # 63-1 at 6, 17-18; 87 at 4 ¶ 1, 6 ¶ 24; 94 at 5 ¶¶ 1, 24).

Gloria Owen is the other 50% owner of Pro-Built and provided a declaration. (Doc. # 90-21). Owen's declaration described "extensive and in-depth" negative press about the oil spill in 2021, as well as her concerns about the potential for Pro-Built's liability to third parties if any pollutants remained on the land. (*Id.* at 2). She declared that the property had a value of $500,000 pre-contamination and $0 post-contamination. (*Id.* at 3). Neither Wiggins nor Owen were disclosed in Plaintiff's Expert Disclosures (Doc. # 81-1 at 2), although they were listed as potential expert witnesses in Plaintiff's Initial Disclosures. (Doc. # 90-25 at 12-13).

### C.    Remediation Efforts

Once he heard about the spill, Mr. Burgess instructed an employee to tell Delta Oil to remove their trucks, totes, and drums from the Burgess property, and cease using Delta Oil to dispose of Burgess's waste oil. (Docs. # 63-2 at 11, 13; 90-2 at 29). On April 18, 2021, Mr. Burgess observed the oil spill on the flat part of the gravel road on the Burgess property and confirmed that Delta Oil had removed its trucks from the property. (Docs. # 63-2 at 46; 87 at 5 ¶ 9; 94 at 5 ¶ 9; 60-3 at 13; 72-1 at 4 ¶ 10; 93 at 4 ¶ 1). Mr. Burgess never called Delta Oil to ask them what

happened because he "figured what happened . . . [a] spill." (Doc. # 63-2 at 13). Mr. Burgess said he believes Delta Oil spilled the oil. (Docs. # 90-2 at 6; 93 at 11 ¶ 3; 97 at 4 ¶ 3).

Around April 19, 2021, Mr. Burgess contacted Spectrum Environmental to remediate the contaminated area. (Docs. # 60-3 at 11; 72-1 at 6 ¶ 19; 93 at 4 ¶ 1, 12 ¶ 6; 63-2 at 11; 87 at 5 ¶¶ 13-14; 94 at 5 ¶ 13; 97 at 4 ¶ 6). Pro-Built did not hire any contractors to clean up its property and did not incur any out-of-pocket costs for remediating the spill. (Docs. # 63-1 at 66; 87 at 7 ¶ 30; 94 at 6 ¶ 30; 60-2 at 18). Spectrum installed oil absorbent booms, mats, an underflow dam, and silt fencing to clean up the affected waterway. (Doc. # 90-3 at 7). An "absorbent boom" is a tool that absorbs oil from waterways after an oil spill. (Doc. # 82-1 at 14). If petroleum products are released into a waterway and then absorbed by an absorbent boom, the boom could test positive for those products. (Doc. # 82-1 at 14). Between the dates of April 21, 2021, and April 28, 2021, Spectrum also removed 283 tons of soil and 4,000 gallons of wastewater. (Doc. # 90-3 at 7; 80-1 at 2). Spectrum completed its remediation efforts in May 2021. (Doc. # 61-2 at 2).

Mr. Burgess paid out of pocket approximately $50,000 to Spectrum and $10,000 to the landfill to take the contaminated dirt but did not request any contribution from Delta Oil. (Docs. # 90-2 at 11, 27, 46; 93 at 12 ¶ 11; 97 at 4 ¶ 11). Mr. Burgess's insurance carrier ultimately reimbursed him for these costs. (Doc. # 90-2 at 27). Beyond these efforts listed above, Mr. Burgess did not investigate the 2021 spill. (Docs. # 90-2 at 29; 93 at 12 ¶ 12; 97 at 4 ¶ 12).

On February 7, 2022, Delta Oil entered into a Consent Order with ADEM in which it agreed to pay ADEM a $58,680 fine for the April 15, 2021 spill, and for spills at Delta Oil facilities in Adger and Cottondale. (Docs. # 90-15 at 3-5, 8; 93 at 10 ¶ 1; 97 at 3 ¶ 1; 94 at 12 ¶ 5(a)). ADEM determined that the spill came from Delta Oil trucks. (Docs. # 90-15 at 2 ¶ 4(a); 93 at 10 ¶ 2; 97 at 3 ¶ 2). The consent order stated that "Delta discharged pollutants to a water of the state without

a permit in violation of Ala. Code § 22-22-9(i)(3)." (Docs. # 90-15 at 2 ¶ 4(b); 93 at 10 ¶ 3; 97 at 3 ¶ 3).

**D.    Remediation Results**

After completing the remediation in May 2021, Spectrum performed additional sampling "to determine if any chemical concentrations remained present in soil, groundwater, surface water, or stream sediments." (Doc. # 60-5 at 11). In June 2021 Spectrum produced a Response Action Report to document their cleanup efforts. (Doc. # 90-3). Spectrum represented that "[a]ll of the soil samples reported Chemicals of Concern (COC) concentrations below the EPA Regional Screening Level (RSL) for residential soils" and for groundwater samples. (Docs. # 90-3 at 10, 11; 93 at 8 ¶ 1; 97 at 2 ¶ 1). Several of the groundwater samples showed contaminant levels above that of the Regional Screening Level for tap water. (Doc. # 90-3 at 11, Table 3.0). The SB3 sample showed that there was Benzene found in the soil sample in an amount of 0.012, which is below the Regional Screening Level for Ethylbenzene (an isomer of Benzene) in residential soil (Docs. # 90-3 at 10; 90-4 at 41) but above the Regional Screening Level for drinking water. (Doc. # 94 at 15 ¶ 8(a)(S) & n.2). The report did not visually show where sample SB3 was collected, but it described the sample as having been taken from the source area on April 28, 2021. (Docs. # 90-3 at 10, 18-20; 93 at 13 ¶ 3, 14 ¶ 5; 97 at 5 ¶¶ 3, 5).

On May 7, 2021, Spectrum emailed its report to ADEM, noting that "all COC concentrations reported appear to be below the respected EPA Regional Screen Level except for two marginal exceedance of lead in groundwater." (Doc. # 61-2 at 2). ADEM responded on May 10, 2021, confirming that it "has reviewed the data and agrees that all parameters measured are below action levels" and that the emergency response at that site had ended. (Doc. # 61-2 at 2-3). On April 29, 2021, Wynn walked the Burgess site and saw no evidence of ongoing contamination.

(Docs. # 60-4 at 16; 67-1 at 26). He also confirmed that the Delta Oil trucks had been removed, there was no sheen in the soil or water, and there was no longer any odor of solvent in the air. (Doc. # 67-1 at 16, 26).

On September 29, 2022, Plaintiff's environmental expert, Abner Patton, collected samples from a test well and from water near the two absorbent booms on the Pro-Built property, and when these were tested none of them showed the presence of contaminants. (Docs. # 82-1 at 14-15, 53; 81-1; 87 at 9 ¶¶ 46, 10 ¶ 54, 48; 94 at 7 ¶¶ 46, 48; 61-5 at 6, 15, 29; 72-1 at 9 ¶ 36, 14 ¶ 39; 93 at 6 ¶ 1). The testing Patton performed on samples taken from the booms themselves showed positive results for Total Petroleum Hydrocarbons (TPH), although he noted that these results could have come from the April 2021 spill. (Docs. # 82-1 at 29, 33; 87 at 10 ¶¶ 57-58, 61; 94 at 8 ¶¶ 48, 57; 90-12 at 2; 90-11 at 8-11, 109-10, 134-35; 93 at 7 ¶ 1; 97 at 1 ¶ 1). Patton testified that he believed the cleanup of the 2021 spill on Pro-Built's property was performed appropriately and adequately "[d]ue to the fact that ADEM and the EPA have signed off on it." (Doc. # 61-5 at 31-32).

Defendant's expert, Steven Hart, opined that the 2021 oil spill affected approximately 0.06 acres of Pro-Built's property. (Docs. # 83-1 at 4; 61-4 at 7; 72-1 at 8 ¶ 31; 93 at 6 ¶ 1). Pro-Built owns roughly thirty-five acres of property at this location. (Doc. # 90-9 at 15). Hart concluded that there was "no ongoing or continuing contamination of [Plaintiff's] property, the unnamed tributary to Carroll Creek or Carroll Creek." (Doc. # 61-4 at 3 ¶ 5).

Delta Oil's Real Estate Valuation Expert, William E. Bliss, performed a case study in accordance with the Uniform Standards of Professional Appraisal Practice, and concluded that "there is no evidence of permanent property value diminution at the subject property as of February 10, 2022." (Docs. # 83-1 at 5; 85-1 at 4, 8-11; 87 at 11 ¶ 65-67; 94 at 9 ¶ 65-67).

7

Wiggins (the 50% owner of Pro-Built) and Owen (the other 50% owner) disagreed, opining that although they valued the property at $500,000 prior to the spill, it is now worthless due to the stigma of reporting about the spill. (Docs. # 63-1 at 38, 41; 90-21 at 3; 87 at 7-8 ¶ 34; 94 at 6 ¶ 34). Owen wrote that this is her "expert opinion based on my ownership of the land and my personal knowledge of the marketability and value of land in the [area]." (Doc. # 90-21 at 3). Wiggins agreed that Owen was a "passive owner" of Pro-Built and that Owen did not have any day-to-day responsibilities or physical presence in the company's office. (Doc. # 90-9 at 7). Wiggins's real estate experience is from building and selling homes for the past twenty-five years, but he has never been a licensed real estate agent or broker in Alabama. (Docs. # 63-1 at 38, 43; 87 at 8 ¶ 43; 90-9 at 37; 94 at 7 ¶ 43). Wiggins testified that the last time he saw a news story about the spill was in 2021. (Doc. # 63-1 at 40). Similarly, Owen only referenced news stories from 2021. (Doc. # 90-21 at 1-2). Wiggins has never listed the property for sale and never had the property appraised. (Doc. # 63-1 at 29-30). Wiggins opined that the Pro-Built property was unique because of its large size and location within city limits. (Doc. # 90-9 at 24 ("I'd put a nice home right here and this home would have access to 35 or 40 acres along this creek."), 28 ("that's a really difficult thing to find inside the city limits")). Prior to the April 2021 spill, the last time Wiggins had been on the property was in the fall of 2020 when he went bow hunting. (Docs. # 63-1 at 27; 87 at 7 ¶ 25; 94 at 5 ¶ 25). Wiggins has not returned to the property since observing the cleanup in April 2021. (Docs. # 63-1 at 51; 87 at 7 ¶ 29; 94 at 6 ¶ 29). Wiggins testified that "I would not let my grandson back there" or harvest deer on the property due to the oil spill. (Docs. # 90-9 at 41; 94 at 31). Wiggins does not know how many or what types of chemicals spilled. (Docs. # 63-1 at 52; 87 at 8 ¶ 42; 94 at 7 ¶ 42).

### E.    Previous Spills

ADEM previously found contamination at two other Delta Oil locations in Cottondale and Adger. (Docs. # 60-4 at 40; 93 at 8 ¶ 7; 97 at 1 ¶ 1, 2 ¶ 7).

ADEM has also previously cited Burgess for other oil spills. In 2013, ADEM notified Burgess of certain oil spill–related issues. (Doc. # 90-20 at 1). Mr. Burgess did not remember investigating this spill. (Doc. # 90-2 at 22). In 2014, ADEM cited Burgess for a spill running down the asphalt drive into the wetland area at the back southwest corner of Burgess's property, which is the same area where the spill occurred in April 2021. (Docs. # 90-2 at 14; 93 at 12 ¶ 8; 97 at 4 ¶ 8). Mr. Burgess did not investigate this spill. (Docs. # 90-2 at 17; 93 at 12 ¶ 8; 97 at 4 ¶ 8). On October 6, 2020, ADEM cited Burgess for oil spills on Burgess's property and referenced oil totes and oil drums – totes and drums owned by Delta Oil. (Docs. # 90-2 at 6, 18, 22; 90-8 at 2; 93 at 12 ¶ 9; 97 at 4 ¶ 9). Mr. Burgess did not investigate the 2020 spill, but he did tell Delta Oil to remove the totes and he cleaned the affected gravel parking lot. (Docs. # 90-2 at 21, 24, 26; 93 at 12 ¶ 10; 97 at 4 ¶ 10).

### F.    Procedural History

Plaintiff sent a sixty-day notice of intent to file suit under the Clean Water Act to Burgess and others after ADEM approved the remediation efforts. (Docs. # 35 ¶ 186; 72-1 at 4 ¶ 8; 87). The operative complaint is Plaintiff's Second Amended Complaint (Doc. # 35), and it asserts claims of trespass, nuisance, negligence/wantonness under Alabama common law, as well as claims under the Clean Water Act. (*Id.*). The summary judgment motions before the court are now fully briefed (Docs. # 87, 93, 94, 96, 97) and ripe for decision.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party

bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Again, Plaintiff asserts the following claims against Defendants: trespass (Count One), nuisance (Count Two), negligence and wantonness (Count Three), and violations of the Clean

Water Act ("CWA") (33 U.S.C. § 1365) (Count Four). After assessing the threshold issue of Article III standing, the court analyzes the merits of each count.

### 1.    Standing

At the outset, the court must examine whether Plaintiff has standing to bring these claims. The court is obligated to examine this issue because it is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Id.* Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. But not all disputes that might be termed "cases" or "controversies" in the colloquial sense count as Article III cases and controversies. The doctrine of standing serves to identify those disputes that qualify as Article III cases and controversies – that is, "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"To establish standing, as [the Supreme] Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Lujan*, 504 U.S. at 560-61).

Plaintiff has not pointed to any admissible Rule 56 evidence that establishes an injury, and therefore Plaintiff has no Article III standing to pursue its claims in this court. At first glance, this conclusion may seem odd, considering that it is undisputed that pollutants spilled on Plaintiff's property. However, Plaintiff only argues its injuries result from a failure to completely remediate

the 2021 spill, diminished property value, interference with property use, and interference with property enjoyment. (Docs. # 94 at 6 ¶ 34, 31; 63-1 at 38, 41; 87 at 7-8). Plaintiff does not allege (and likely cannot assert) that anyone was physically injured while on the property or that it lost use or rental value of the land during the remediation efforts. Therefore, Plaintiff's standing rests on whether there is any admissible evidence to show that the spill was not completely remediated, that its property value diminished because of the spill, or that the spill interfered with Plaintiff's use and enjoyment of the property. Plaintiff has not made a sufficient showing as to any of these points.

### a.    Remediation of the Spill

Although Plaintiff attempts to refute the point, it is undisputed in the Rule 56 record that the April 15, 2021 spill was completely remediated. Spectrum's Report indicates that all soil and groundwater samples reported Chemicals of Concern concentrations below the EPA Regional Screening Level for residential soils. (Docs. # 90-3 at 10-11; 93 at 8 ¶ 1; 97 at 2 ¶ 1). ADEM received a copy of this report and confirmed that because "all parameters measured are below action levels," the emergency response at that site could end. (Doc. # 61-2 at 2-3). At the conclusion of Spectrum's cleanup effort, Wynn (a Senior Environmental Scientist with ADEM) walked the Burgess site and saw no evidence of ongoing contamination. (Docs. # 60-4 at 16; 67-1 at 26). Finally, Plaintiff's own environmental expert, Abner Patton, sampled water taken from a test well and near both booms on Pro-Built's property roughly one year after the spill and confirmed that none of those samples tested positive for contaminants. (Docs. # 82-1 at 14-15, 53; 81-1; 87 at 9 ¶¶ 46, 10 ¶ 54, 48; 94 at 7 ¶¶ 46, 48; 61-5 at 6, 15, 29; 72-1 at 9 ¶ 36, 14 ¶ 39; 93 at 6 ¶ 1). The testing Patton performed on samples taken from the booms themselves showed positive results for Total Petroleum Hydrocarbons (TPH), but Patton admitted that these results could have

come from the April 2021 spill. (Docs. # 82-1 at 29, 33; 87 at 10 ¶¶ 57-58, 61; 94 at 8 ¶¶ 48, 57; 90-12 at 2; 90-11 at 8-9, 11, 13-14, 109-10, 134-35; 93 at 7 ¶ 1; 97 at 1 ¶ 1). And critically, Patton testified that he believed the cleanup of the spill was performed appropriately and adequately "[d]ue to the fact that ADEM and the EPA have signed off on it." (Doc. # 61-5 at 31-32).

Plaintiff attempts to rebut this evidence by arguing that Spectrum's report was deceptive for multiple reasons. For example, Plaintiff asserts that the report did not visually display where one of the samples (SB3) came from. (Doc. # 94 at 7). Although the report did not visually display this, it described the SB3 sample as having been taken from the source area on April 28, 2021. (Docs. # 90-3 at 10, 18-20; 93 at 13 ¶ 3, 14 ¶ 5; 97 at 5 ¶¶ 3, 5). Further, the SB3 sample only revealed that there was Benzene found in the soil sample at a level of 0.012, which is below the Regional Screening Level for Ethylbenzene (an isomer of Benzene) in residential soil (Docs. # 90-3 at 10, Table 2.0; 90-4 at 41), but above the level for tap water. (Doc. # 94 at 15 ¶ 8(a)(S) & n.2).

Plaintiff adds that although the report listed the numerical results of each sample, it highlighted that all samples complied with Regional Screening Levels for *residential soil* without noting that some did not comply with the levels for *tap water*. (*See, e.g.*, Docs. # 93 at 5; 94 at 7, 9, 16). There is no dispute that the report includes correct information – the only assertion is that it deceptively frames the information presented. But it is not clear to the court why this framing was deceptive. The report lists all numerical measurements that are detectable, and this would allow anyone reading the report to compare these numbers to the Residential Screening Levels for either residential soils or tap water. ADEM and the EPA received the report (*see* Doc. # 61-2 at 2-3); therefore, they had the opportunity to compare the results of Spectrum's samples with the Regional Screening Levels they deemed appropriate (either the levels for residential soils or those for tap water).

Nor does Plaintiff explain why the Regional Screening Levels for tap water are more appropriate than those for residential soils to measure whether pollution in soil and groundwater had been remediated. Why a cleanup of a river and surrounding soil would be complete before it is clean enough to be tap water is self-evident. But, most importantly for the court, the agencies in charge of monitoring environmental cleanup efforts – ADEM and the EPA – signed off on it. There is no explanation as to why a comparison to Regional Screening Levels for residential soils is deceptive, and why ADEM and the EPA would not have been able to examine the report results themselves to see through any alleged deception. Plaintiff's attempt to rebut the Rule 56 evidence of complete remediation falls flat.

Even apart from the question of whether the Spectrum Report was deceptive, Plaintiff's *own* expert tested samples from a test well and surface water on the Pro-Built property and confirmed that none tested positive for contaminants.[1] (Docs. # 82-1 at 14-15, 53; 81-1; 87 at 9 ¶¶ 46, 10 ¶ 54, 48; 94 at 7 ¶¶ 46, 48; 61-5 at 6, 15, 29; 72-1 at 9 ¶ 36, 14 ¶ 39; 93 at 6 ¶ 1). Therefore, there is no genuine dispute of material fact as to whether Defendant Burgess adequately remediated Pro-Built's property following the April 15, 2021 oil spill.

Not only has there not been a showing of injury from a lack of complete remediation, but Plaintiff also did not suffer any injury (monetary or otherwise) from hiring contractors to clean up its property, nor from any other out-of-pocket costs. (Docs. # 63-1 at 66; 87 at 7 ¶ 30; 94 at 6 ¶ 30; 60-2 at 18).

---

[1] Again, the court acknowledges that Plaintiff's expert also took samples from the absorbent booms that tested positive for TPH, but these booms were placed precisely to help absorb pollutants from the water (Doc. # 82-1 at 14), and (again) Plaintiff's expert admitted that the TPH could have come from the April 15, 2021 spill. (*Id.* at 33).

### b.    Diminution in Value

Plaintiff's other theory of injury is that the Pro-Built property diminished in value. (*See* Doc. # 63-1 at 38, 41). In that vein, Wiggins (the 50% owner of Pro-Built) and Owen (the other 50% owner) opined that although they valued the property at $500,000 prior to the spill, it is now worthless due to the stigma of the spill. (Docs. # 63-1 at 38, 41; 90-21 at 3; 87 at 7-8 ¶ 34; 94 at 6 ¶ 34). Plaintiff has not offered any expert opinion as to the value of the Pro-Built land. Plaintiff's expert disclosures only identified Abner Patton as an expert witness (Doc. # 81-1 at 2), and Plaintiff's Initial Disclosures did not provide the information required to establish Wiggins or Owen as experts. (*See* Doc. # 90-25 at 1-2). Specifically, Rule 26(a)(2)(C) requires that if there are expert witnesses who will not provide a written report, a party must disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Plaintiff's Initial Disclosures merely described how Wiggins and Owens "will provide lay testimony as the primary members of Pro-Built as to the value of the property and the loss in value to the property." (*Id.* at 12-13). Although this describes the general subject matter on which these witnesses would present evidence, it falls short of listing the specific facts or opinions to which these witnesses would testify. Therefore, it is abundantly clear that Wiggins and Owen are lay witnesses, not expert witnesses.

Delta Oil's Real Estate expert disagreed with the lay opinions of Wiggins and Owen, concluding that "there is no evidence of permanent property value diminution at the subject property as of February 10, 2022." (Docs. # 83-1 at 5; 85-1 at 4, 8-11; 87 at 11 ¶ 65-67; 94 at 9 ¶ 65-67). For this disagreement to create a material dispute of fact, however, Wiggins's and Owen's lay opinion testimony about the value of the Pro-Built land must be admissible.

Rule 701 of the Federal Rules of Evidence permits lay witnesses to offer opinion testimony "that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A lay witness's opinion must be derived from their personal knowledge or experience. *Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake Cnty. Fla.*, 947 F.3d 1362, 1368 (11th Cir. 2020) (citing Fed. R. Evid. 701 advisory committee's note to 2000 amendment). "As a general rule, 'an owner of property is competent to testify regarding its value.'" *Id.* (quoting *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir. 1983)). However, a landowner's testimony in this area has its limits. If the owner's testimony is based on speculative factors and offers minimal probative value, the court may exclude this lay witness testimony. *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1250-51 (11th Cir. 2018).

In *Williams*, the Eleventh Circuit upheld a district court's decision to exclude a homeowner's testimony about the value of her home because her opinion was based merely on speculation. *See id.* Specifically, the homeowner testified that a nearby factory's emission of toxic chemicals had "diminished the value of her home to the point where it was unsellable." *Id.* at 1244. The Eleventh Circuit held that this testimony was based only on speculation because the homeowner admitted that she had not tried to sell her home, had not spoken with an appraiser, and had not spoken with a real estate agent to ascertain its value. *Id.* at 1250.

Like the homeowner in *Williams*, Wiggins admitted that he had not tried to sell the property and had never had the property appraised. (Doc. # 63-1 at 29-30). Although Wiggins has real estate experience, he is not a licensed real estate agent and did not testify that he had spoken to one about the current value of the Pro-Built property. (Docs. # 63-1 at 38, 43; 87 at 8 ¶ 43; 90-9 at 37; 94 at

7 ¶ 43). Owen also did not declare that she had taken any of these actions, nor that she had any real estate experience. (Doc. # 90-21). In some ways, Wiggins and Owen have even less of a basis from which to assess the value of the Pro-Built property than did the homeowner in *Williams*. While the homeowner in *Williams* lived on the property in question, allowing her to assess the value of the property through her personal experience with the property, Wiggins has not returned to the Pro-Built property since April 2021 (Docs. # 63-1 at 51; 87 at 7 ¶ 29; 94 at 6 ¶ 29), and there is no indication that Owen has ever set foot on the Pro-Built property. (Docs. # 90-21; 90-9 at 7 (agreeing that Owen is a "passive owner")). Additionally, Wiggins admitted that he did not know the types or quantities of pollutants that were spilled on Pro-Built's property. (Docs. # 63-1 at 52; 87 at 8 ¶ 42; 94 at 7 ¶ 42).[2]

Conversely, in *Sabal Trail*, the district court *allowed* a homeowner to testify about the value of her land because her opinion was based on her personal knowledge, not speculation. *Sabal Trail, Transmission, LLC v. 3.921 Acres of Land in Lake Cnty. Fla.* 947 F.3d 1362, 1369-70 (11th Cir. 2020). The Eleventh Circuit highlighted that unlike in *Williams*, the homeowner in *Sabal Trail* had personal knowledge of how much her land had diminished in value. This was because the homeowner in *Sabal Trail* had prior experience selling twenty-five similar lots in the same area and had interacted with prospective purchasers of those lots in a way that convinced her of what that type of purchaser would want in that type of lot. *Id.* at 1369. In some ways, Wiggins resembles the homeowner in *Sabal Trail* because like that homeowner, Wiggins has experience (twenty-five years) of building and selling homes, including lots and homes in the same area as the Pro-Built

---

[2] Owen alleged that "[t]esting" done after the cleanup showed the presence of certain cancer-causing chemicals, and that "I know personally that these chemicals are highly dangerous to humans." (Doc. # 90-21 at 2). Because Owen does not specify what tests she is referring to, the court assumes she is referring to either the Spectrum or the Patton testing, both of which as discussed above showed that all chemicals of concern were below the Regional Screening Levels for residential soil. (Docs. # 93 at 5; 94 at 7, 9, 16).

property. (Docs. # 63-1 at 38, 43; 87 at 8 ¶ 43; 90-9 at 37; 94 at 7 ¶ 43).[3] However, Wiggins repeatedly emphasized how unique the Pro-Built parcel of land was due to its large size and location within city limits. (Doc. # 90-9 at 24 ("I'd put a nice home right here and this home would have access to 35 or 40 acres along this creek."), 28 ("that's a really difficult thing to find inside the city limits")). While the Pro-Built parcel is roughly thirty-five acres, the other parcels of land Wiggins described building on and selling were smaller, including a one-acre lot "right across the road," (Doc. # 90-9 at 46), a "one-acre lot" in a subdivision (*id.*), and small residential lots also in a subdivision. (*Id.* at 28). This highlights a significant difference between properties with which Wiggins has experience and the Pro-Built property, further lessening Wiggins's basis for offering a lay opinion of the Pro-Built property's current value.

Ultimately, both *Williams* and *Sabal Trail* outline permissible exercises of a district court's discretion under Rule 701. An appellate court reviews a district court's evidentiary rulings under the abuse of discretion standard, *Williams*, 889 F.3d at 1250, so these cases provide examples of ways a district court may permissibly exercise its discretion in making evidentiary rulings. Although the undisputed facts of this case resemble some of the facts in both *Williams* and *Sabal Trail*, they more closely resemble those in *Williams* and therefore, the court excludes Wiggins's testimony on the diminution in value of Pro-Built's property.

Central to this ruling are the undisputed facts that neither Wiggins nor Owen had ever listed the property for sale, had the property appraised, identified a post-2021 news story about the spill, returned to the property since 2021 (or in Owen's case, ever), learned what amount or type of chemicals were spilled, or testified that they had ever sold a similarly sized or situated property. Although Wiggins had twenty-five years of experience building and selling properties, the

---

[3] Again, Owen has never suggested that she has any real estate experience. (Doc. # 90-21).

properties he described selling were smaller and often in subdivisions. The facts in this case therefore significantly diverge from those in *Sabal Trail*, in which the homeowner described in detail her experience selling similarly sized properties in the same area or subdivision and speaking with buyers of those properties about the things they value. Given these considerations, Wiggins's and Owen's testimony on the diminution in value of Pro-Built's property is excluded.

Because the Rule 56 record contains an expert opinion that "there is no evidence of permanent property value diminution at the subject property as of February 10, 2022." (Docs. # 83-1 at 5; 85-1 at 4, 8-11; 87 at 11 ¶ 65-67; 94 at 9 ¶ 65-67), and because Plaintiff has not pointed to any admissible evidence to rebut this expert opinion, there is no genuine dispute of material fact that Plaintiff's land suffered no diminution in value due to the April 15, 2021 oil spill.

### c.    Interference with Use and Enjoyment

Wiggins testified that Pro-Built will not be able to sell the property as Pro-Built had intended because the stigma associated with the land following the April 2021 spill will deter potential buyers. (Docs. # 63-1 at 38, 41; 87 at 7-8 ¶ 34; 94 at 6 ¶ 34). Owen wrote similarly in her declaration, adding that she was concerned about the potential for future liability if third parties or buyers are injured by the continued presence of pollutants. (Doc. # 90-21 at 2).

Like Wiggins's and Owen's testimony about diminution in value, these statements about use and enjoyment are lay opinions under Rule 701 of the Federal Rules of Evidence. And, for the same reasons as laid out above, Wiggins and Owen base this testimony on pure speculation. Neither Wiggins nor Owen had ever listed the property for sale, had the property appraised, identified a post-2021 news story about the spill, returned to the property since 2021 (or in Owen's case, ever), learned what amount or type of chemicals were spilled, or testified that they had ever sold a similarly sized or situated property. Neither claimed to be a licensed real estate agent or

broker, and neither testified that they had sold any similarly sized or situated parcels of land that would give them personal knowledge about how easy it would be to sell these thirty-five acres post-spill. Additionally, Owen's asserted injury of concern about liability assumes that there are cancer-causing chemicals still in the soil and water. But, as discussed above, it is undisputed that the spill was completely remediated, so this injury is purely speculative. Because Wiggins's and Owen's testimony on this injury is based on speculation and not on personal knowledge, the court likewise excludes this evidence as inadmissible under Rule 701.

Plaintiff also claims interference with its use and enjoyment of the land in the form of Wiggins's reluctance to allow his grandson to play on the land or to harvest deer from it. (Doc. # 94 at 31). Although Wiggins is a 50% owner and member of Pro-Built, LLC, the plaintiff in this case is Pro-Built, LLC – not Wiggins. State law determines who has a legal interest in property. *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007). As an LLC member, Wiggins "has no interest in any specific property of a limited liability company or a series thereof." Ala. Code § 10A-5A-4.02. Because Wiggins does not have a legal interest in Pro-Built's property, Wiggins's reduced use of the Pro-Built land is not evidence of Pro-Built's injury.

Plaintiff has not presented any admissible Rule 56 evidence of an injury related to the 2021 spill. As such, there is no genuine dispute of material fact that Plaintiff lacks Article III standing for all its claims.

However, even though Plaintiff lacks standing, in the interest of completeness, the court examines how Plaintiff's claims also fail on their own merits.

### 2.    Trespass (Count One)

Plaintiff's trespass claim fails because it can point to no evidence showing actual damages. Plaintiff claims indirect (rather than direct) trespass. A direct trespass involves another person

physically entering land, while an indirect trespass involves doing an action which causes some invasion of land. *See Born v. Exxon Corp.*, 388 So. 2d 933, 934 (Ala. 1980) ("It seems clear . . . that in order for one to be liable to another for trespass, the person must intentionally enter upon land in the possession of another." (internal citations omitted)). While a claim for a direct trespass does not require a plaintiff to show actual damages, a claim for indirect trespass does. *See Borland v. Sanders Lead Co.*, 369 So. 2d 523, 529 (Ala. 1979). So, the question is whether there is sufficient evidence in the Rule 56 record to support a claim for indirect trespass.

To prove a claim of indirect trespass under Alabama law, a plaintiff must establish: "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the *res*." *W. T. Ratliff Co., Inc. v. Henley*, 405 So. 2d 141, 145 (Ala. 1981). As discussed above, Plaintiff has not pointed to any admissible record evidence of an injury. Specifically, Plaintiff did not identify any portion of the Rule 56 record to establish the alleged injuries of incomplete remediation of the spill, diminution in property value, and interference with use and enjoyment of the property. Therefore, Plaintiff's indirect trespass claim fails because it cannot show "substantial damages to the *res*." *Id.* Defendants are thus entitled to summary judgment on Count One.

### 3.     Nuisance (Count Two)

Alabama law defines "nuisance" as "anything that works hurt, inconvenience, or damage to another." Ala. Code § 6-5-120. Alabama common law further defines the damage of a nuisance as "intrusion [] to the interest in use and enjoyment of property." *Borland v. Sanders Lead Co., Inc.*, 369 So. 2d 523, 529 (Ala. 1979). "The classic cases of the barking dog, the neighboring

bawdy house, noise, smoke, fumes, or obnoxious odors generally invoke the doctrine of the law of nuisance." *Id.* at 529.

Specific to the loss of use and enjoyment, Plaintiff contends that "Pro-Built was created expressly to sell land there but cannot sell contaminated land." (Doc. # 94 at 31). As noted above, the court concludes that there is no Rule 56 record evidence to support a finding that Pro-Built will not be able to sell the property or will likely suffer liability. This is because there is no admissible evidence supporting why Pro-Built will be unable to sell the land. There is simply no genuine basis to dispute that the spill was completely remediated, and Wiggins has no standing to claim personal loss of use or enjoyment of land as an injury to Pro-Built. In sum, Plaintiff has presented no admissible evidence of a loss of use or enjoyment of its land, which is a required element of nuisance. Defendants are thus entitled to summary judgment on Count Two.

### 4.    Negligence/Wantonness (Count Three)

The elements of a negligence claim under Alabama law are well established: a duty, breach of that duty, causation, and damage. *Armstrong Business Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001) (citing *AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141, 1144 (Ala. 1998)). As discussed above regarding Plaintiff's trespass and nuisance claims, Plaintiff presents no admissible evidence of any damage arising from the April 15, 2021 spill. Because there is no Rule 56 evidence to support this essential element of a negligence claim, Defendants are entitled to summary judgment on the negligence claim.

"'Wantonness' is qualitatively different from 'negligence' and involves 'the conscious doing of some act or omission of some duty while knowing of the existing conditions <u>and</u> being conscious that, from doing or omitting to do an act, injury will likely or probably result.'"

*Armstrong v. Hill*, 290 So. 3d 411, 418 (Ala. 2019) (quoting in part *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007)).

Although injury is not an explicit element of wantonness, the lack of actual damages forecloses relief under this claim. As discussed above, it is undisputed that Plaintiff can show no injury from the April 2021 spill. Therefore, compensatory damages would not be available. This means that punitive damages are also unavailable. "Compensatory or nominal damages must first be awarded before punitive damages can be assessed." *Guyoungtech USA, Inc. v. Dees*, 156 So. 3d 374, 385 (Ala. 2014). Plaintiff did not make a claim for nominal damages in its complaint. (Doc. # 35 ¶¶ 188-91). Not only does Alabama state law foreclose awarding punitive damages without some damages, but constitutional law would likely foreclose such a result as well. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (instructing courts to consider the "disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996) (similar). Finally, injunctive relief would not redress a successful wantonness claim because there is no activity to enjoin. As discussed above, it is undisputed that the spill was completely remediated, and there are no claims of an ongoing spill.

As Plaintiff cannot show that it suffered actual damages, Plaintiff's negligence claim fails on its merits. Plaintiff's wantonness claim also fails because the court cannot provide any meaningful relief. Defendants are thus entitled to summary judgment on Count Three.

### 5.    Clean Water Act (Count Four)

Plaintiff's CWA claim also fails because it lacks standing as a citizen-plaintiff. In order to establish a CWA violation, a plaintiff must show that "(1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES

permit." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). The CWA allows private citizens to bring suit to enforce the CWA if they comply with a requirement that they give sixty days of notice to the EPA, the State in which the alleged violation occurred, and the alleged violator. 33 U.S.C. § 1365(b). To be sure, Plaintiff gave the required sixty days of notice in this case. (*See* Docs. # 35 ¶ 186; 72-1 at 4 ¶ 8; 87). But that does not end the inquiry. Because "the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987), citizens lack statutory standing to sue for CWA violations if those violations have ceased by the time they file their complaint. *Id.* at 56-63. "Citizens can only bring a citizen suit under the CWA for ongoing or continuous violations, not for those that are wholly in the past." *Parker*, 386 F.3d at 1009 (citing *Gwaltney*, 484 U.S. at 56-63).

Plaintiff concedes that it lacks standing to pursue a CWA claim against Delta Oil because they are "wholly past violations." (Doc. # 94 at 15). Nevertheless, it maintains that it can pursue a CWA claim against Burgess because there is a "reasonable likelihood that a past polluter will continue to pollute in the future." (*Id.*) (quoting *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1239 (N.D. Ala. 2018); *see also* Doc. # 93 at 19). The only CWA violation Plaintiff claims is related to the oil spill from April 15, 2021, which Plaintiff contends came from the point source of two Delta Oil trucks. (Doc. # 35 ¶¶ 146, 155, 158, 171, 173). Regarding this spill, Plaintiff makes two arguments: (1) that the spill was not completely remediated, and (2) that this claim is not moot because Burgess might repeat this violation. (Docs. # 93 at 22-23; 94 at 15-16).

Plaintiff's first argument, that the spill was not completely remediated. But that position finds no support at all in the Rule 56 record nor in case law. As discussed above, there is no genuine

dispute of material fact as to whether Pro-Built's property was adequately remediated following the April 2021 oil spill.

Further, even if Plaintiff had pointed to evidence in the Rule 56 record showing a genuine dispute as to the remediation issue, this evidence would still not support a legally viable CWA claim. To maintain a CWA claim, a citizen-plaintiff must show that there are some "ongoing or continuous violations." *Parker*, 386 F.3d at 1009 (citing *Gwaltney*, 484 U.S. at 56-63). A failure to remediate would not create any new violations of the CWA but would instead be an ongoing effect of a past violation. *Plantation Pipe Line Co.*, 315 F. Supp. 3d at 1239 (holding that a citizen-plaintiff can only sue under the CWA for an ongoing discharge from a point source and not for ongoing effects of a discharge that had been repaired).[4] This is because a CWA violation requires a discharge from a point source, which the CWA defines as "any discernible, confined and discrete conveyance," which could include a "pipe, ditch, [or] channel." 33 U.S.C. § 1362(14). It is as tautological as it is true: because a point source is required to establish a CWA violation, where the only point source in a case has been removed or is no longer discharging, there can be no ongoing CWA violation.

Plaintiff's amended complaint only identifies the Delta Oil trucks as a point source. (Doc. # 35 ¶¶ 93, 115, 137, 158, *et seq.*). Plaintiff later describes various other items as potential point sources, including the driveway on Burgess's property (Doc. # 93 at 22) as well as "buckets, chemical totes, [and] rusted oil barrels," which were photographed on Burgess's property in 2014. (*Id.* at 20). Despite this change in Plaintiff's definition of point sources, the court reviews Plaintiff's complaint, rather than its summary judgment briefing, as "a plaintiff cannot amend

---

[4] There is an exception for discharges of fill material into navigable waters. *See Black Warrior River-Keeper, Inc. v. Drummond Co., Inc.*, 387 F. Supp. 3d 1271, 1297 (N.D. Ala. 2019). But, the instant case does not involve fill material, which is "unlike other pollutants in navigable waters" in that it does not dissipate or dissolve over time. *Id.*

[their] complaint through argument made in [their] brief in opposition to the defendant's motion for summary judgment." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013)). And it is undisputed that the Delta Oil trucks, the only point source identified in the pleadings, were removed.

Even if the court considered the buckets, totes, oil barrels, and driveway as point sources, Plaintiff's failure to remediate argument focuses on an alleged continued presence of pollutants in surface water, groundwater, and soil. (*See* Doc. # 93 at 14-15). Plaintiff does not contend that Defendant Burgess committed an ongoing violation of the CWA because it somehow failed to remediate the presence of pollutants in its own driveway, or in various buckets, totes, and oil barrels that were photographed on its property in 2014.

Focusing on the surface water, groundwater, and soil, none of these are point sources that were identified in Plaintiff's amended complaint, nor could they be point sources because they are not a "discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). Because they are not point sources, any pollution remaining in the surface water, groundwater, or soil would not constitute an ongoing violation of the CWA, but instead would be an ongoing effect of a past violation. Plaintiff therefore cannot point to any Rule 56 record evidence to support its claim that Defendant Burgess failed to remediate the effects of the April 2021 spill and, in any event, there is no legal basis to argue that any such failure would constitute an ongoing CWA violation.

Similarly, Plaintiff's second argument, that the violation is intermittent because Burgess is likely to repeat this violation, finds no support in the Rule 56 record or in case law. This argument is based on the Supreme Court's interpretation of the CWA's language "to be in violation." In *Gwaltney*, the Supreme Court held that this language means that a citizen-plaintiff must "allege a

state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57.

"A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Export Ass'n*, 393 U.S. 199, 203 (1968). It is undisputed that the Delta Oil trucks – the only point source Plaintiff identified in its amended complaint – were removed. (*See* Docs. # 63-2 at 46; 87 at 5 ¶ 9; 94 at 5 ¶ 9; 60-3 at 13; 72-1 at 4 ¶ 10; 93 at 4 ¶ 1; 67-1 at 16, 26; 93 at 4). Without any remaining point source, it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Export Ass'n*, 393 U.S. at 203.

Plaintiff's additional arguments on this theory also miss the mark. Plaintiff contends that Burgess is a risk for future pollution spills because (1) it has a history of these spills in 2013, 2014, and 2020 and (2) it never investigated those spills. (Doc. # 93 at 22-23). Plaintiff also contends that a driveway on Burgess's property sloping down to Pro-Built's property makes it more likely that Burgess could violate the CWA by spilling on this driveway. (*Id.* at 21-22).

"The law does not require a defendant to show that there is no conceivable chance that a future violation will occur, but only that 'there is no reasonable expectation that the wrong will be repeated.'" *Atlantic States Legal Foundation, inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1135 n.13 (11th Cir. 1990) (quoting in part *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). In *Tyson Foods*, the Eleventh Circuit did not disturb a district court's entry of summary judgment denying injunctive relief where a defendant had started complying with the CWA before the complaint was filed. *Id.* at 1133.[5] In doing so, the Eleventh Circuit noted that the defendant was still discharging wastewater from its plant, but that defendant was now discharging in compliance

---

[5] The *Tyson Foods* court reversed and remanded on different grounds. *Id.* at 1143.

with the CWA. *Id.* at 1134-35 & 1135 n.13. Therefore, even though the company was non-compliant in the past, and even though the company was continuing the same operations that had been the subject of a CWA violation, the Eleventh Circuit held that this did *not* create a reasonable likelihood that the defendant's CWA violation would recur. *Id.*

Just as the Eleventh Circuit highlighted in *Tyson Foods*, this court concludes that the mere fact that Defendant Burgess is continuing to operate its business on the same property where a spill occurred previously is not enough to show that Burgess is reasonably likely to violate the CWA in the future. Plaintiff has not presented any case law (nor is the court aware of any) that indicates that a failure to investigate previous pollution incidents establishes that a defendant is likely to violate the CWA in the future. Nor does the continuing existence of the driveway sloping to Plaintiff's property move the needle. The court cannot assume that Defendant Burgess is likely to violate the CWA in the future merely because Burgess did not remove its driveway, did not move its business, and purportedly did not investigate previous pollution incidents that may or may not have been CWA violations.

The Rule 56 record therefore contains no competent evidence that Defendant Burgess is likely to violate the CWA in the future. For this reason, neither of Plaintiff's theories are sufficient to confer citizen-plaintiff standing under the CWA. Because Plaintiff has no citizen-plaintiff standing to assert a CWA claim, Defendant Burgess is entitled to summary judgment on Count Four. Defendant Delta Oil is also entitled to summary judgment on Count Four, as Plaintiff has candidly conceded that it does not have citizen-plaintiff standing to pursue a CWA claim against Delta Oil.

**IV.    Motion in Limine**

Defendants also filed a Motion in Limine (Doc. # 86) to exclude the testimony offered by Plaintiff's expert, Abner Patton, that the two absorbent booms in Carroll Creek show contamination from the April 2021 spill from the Burgess property. The above analysis considers Patton's acknowledgment in his deposition that the absorbent booms tested positive for TPH, but that that could have come from the April 2021 spill. Defendants' Motion in Limine aims to exclude a different opinion – that the TPH *definitively* came from the April 2021 spill. Because this memorandum opinion does not rely on Patton's opinion that Defendants' Motion in Limine seeks to exclude, the Motion (Doc. # 86) is moot.

**V.    Conclusion**

For the reasons discussed above, Defendant Delta Oil Services Inc.'s Motion for Summary Judgment (Doc. # 62) and Defendant Burgess Equipment Repair LLC's Motion for Summary Judgment (Doc. # 72) are due to be granted. The Motion in Limine to Exclude Testimony of Abner Patton filed by both Defendants (Doc. # 86) is moot. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this December 10, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE